UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

SEP 07 2010

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

---

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

   v.

BRYAN LAURIENTI, a/k/a BRYAN
ANTHONY LAURIENTI,

              Defendant - Appellant.

No. 07-50240

D.C. No. CR-03-00620-TJH-03
U.S. District Court for Central
California, Los Angeles

**MANDATE**



---

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

   v.

DONALD SAMARIA, akas Donald S.
Samaria, Donald Samuel Samaria, Jr.,
Donny Samaria, Don Samaria, Donald
Samuel Samaria,

              Defendant - Appellant.

No. 07-50358

D.C. No. CR-03-00620-TJH-8
U.S. District Court for Central
California, Los Angeles

---

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

No. 07-50365

v.

DAVID MONTESANO,

                Defendant - Appellant.

D.C. No. CR-03-00620-TJH-05
U.S. District Court for Central
California, Los Angeles

UNITED STATES OF AMERICA,

                Plaintiff - Appellee,

v.

CURTISS PARKER,

                Defendant - Appellant.

No. 07-50367

D.C. No. CR-03-00620-TJH-06
U.S. District Court for Central
California, Los Angeles

UNITED STATES OF AMERICA,

                Plaintiff - Appellee,

v.

BRYAN LAURIENTI, AKA BRYAN
ANTHONY LAURIENTI,

                Defendant - Appellant.

No. 09-50081

D.C. No. 2:03-cr-00620-TJH-3
U.S. District Court for Central
California, Los Angeles

The judgment of this Court, entered June 16, 2010, takes effect this date.

This constitutes the formal mandate of this Court issued pursuant to Rule

41(a) of the Federal Rules of Appellate Procedure.

FOR THE COURT:

Molly C. Dwyer
Clerk of Court
/s/
Theresa Benitez
Deputy Clerk

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

BRYAN LAURIENTI, a/k/a BRYAN
ANTHONY LAURIENTI,
*Defendant-Appellant.*

Nos. 07-50240
        09-50081

D.C. No.
CR-03-00620-
TJH-03

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

DONALD SAMARIA, akas Donald S.
Samaria, Donald Samuel Samaria,
Jr., Donny Samaria, Don Samaria,
Donald Samuel Samaria,
*Defendant-Appellant.*

No. 07-50358
D.C. No.
CR-03-00620-TJH-8

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

DAVID MONTESANO,
*Defendant-Appellant.*

No. 07-50365
D.C. No.
CR-03-00620-
TJH-05

8798          UNITED STATES v. LAURIENTI

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

          v.

CURTISS PARKER,
                    *Defendant-Appellant.*

No. 07-50367

D.C. No.
CR-03-00620-
TJH-06

ORDER AND
OPINION

Appeals from the United States District Court
for the Central District of California
Terry J. Hatter, District Judge, Presiding

Argued and Submitted
April 8, 2010—Pasadena, California

Filed June 16, 2010

Before: Barry G. Silverman and Susan P. Graber,
Circuit Judges, and Frederick J. Scullin, Jr.,*
District Judge.

Opinion by Judge Graber

*The Honorable Frederick J. Scullin, Jr., Senior United States District
Judge for the Northern District of New York, sitting by designation.

## COUNSEL

Dennis P. Riordan, Riordan & Horgan, San Francisco, California; Jonathan D. Libby, Deputy Public Defender, Los

Angeles, California; Karen L. Landau, Oakland, California; and Irene P. Ayala, Los Angeles, California, for the defendants-appellants.

Ellen R. Meltzer, Fraud Section, Criminal Division, United States Department of Justice, Washington, D.C., for the plaintiff-appellee.

## ORDER

The opinion filed June 8, 2010, slip opinion at 8193, is hereby withdrawn. The attached opinion is ordered filed in its place and constitutes the opinion for the court.

## OPINION

GRABER, Circuit Judge:

After the collapse of a securities fraud "pump and dump" scheme, the government indicted the owners, managers, and senior brokers of a securities broker-dealer firm. The owners and managers pleaded guilty to charges of criminal securities fraud, but the senior brokers, including Defendants Bryan Laurienti, Curtiss Parker, Donald Samaria, and David Montesano, pleaded not guilty. Defendants conceded that a fraudulent scheme existed but argued that they had not joined the conspiracy or engaged in fraudulent acts; rather, they were innocent brokers selling stocks to their clients, caught in the government's overly wide criminal dragnet. The jury found otherwise and convicted Defendants on all counts. Defendants appeal their convictions and sentences. We affirm Defendants' convictions but vacate their sentences and remand for resentencing.

### FACTUAL AND PROCEDURAL HISTORY

Hampton Porter Investment Bankers, LLC ("Hampton Porter"), was a securities broker-dealer firm registered with the

United States Securities and Exchange Commission ("SEC").
In the late 1990s and early 2000s, Hampton Porter's owners
and top-level managers engaged in what is known as a "pump
and dump" scheme. Certain publicly traded companies
granted Hampton Porter (or its owners) large blocks of free,
or deeply discounted, stock. In return, Hampton Porter drove
up the price of these thinly traded stocks by pressuring unsus-
pecting clients into purchasing shares, by strongly discourag-
ing clients from selling shares, and by refusing in some
instances to execute clients' sales orders. In the meantime,
Hampton Porter and others who stood to benefit from the
scheme sold their shares at artificially inflated prices. *See gen-
erally United States v. Zolp*, 479 F.3d 715, 717 n.1 (9th Cir.
2007) (describing a "pump and dump" scheme); *United States
v. Skelly*, 442 F.3d 94, 96-97 (2d Cir. 2006) (same).

When the stock market fell sharply in 2000, Hampton Por-
ter's scheme crashed with it. Hampton Porter went out of
business in 2001. After an investigation, the government
indicted Hampton Porter's owners, managers, and senior bro-
kers.[1] The indictment alleges that the defendants participated
in a securities fraud conspiracy, in violation of 18 U.S.C.
§ 371, 15 U.S.C. § 78j(b), and 15 U.S.C. § 78ff and, by incor-
poration, 17 C.F.R. § 240.10b-5. The indictment alleges that
the "purpose of the conspiracy was to enrich defendants and
their co-conspirators by means of the fraudulent sales of
securities to the customers of Hampton Porter." The indict-
ment also alleges additional counts against individual defen-
dants in connection with specified stock purchases for acts
committed "in furtherance of the fraudulent scheme."

The government's investigation uncovered overwhelming
evidence that the criminal conspiracy existed and that the
owners and managers were complicit. The owners and man-

---

[1]The government also initiated civil proceedings against Hampton Por-
ter and its employees. Evidence of those proceedings was not admitted at
trial, and they are not relevant to these appeals.

agers pleaded guilty to various charges and, in plea agreements, agreed to testify against the senior brokers, who are Defendants here. Defendants pleaded not guilty, and the district court presided over a 14-day jury trial.[2]

Much of the testimony and documentary evidence at trial concerned Defendants' receipt of "bonus commissions" when a client purchased shares of four targeted stocks, referred to by Defendants as "house stocks."[3] The commission structure worked in the following manner. On the purchase of all stocks, the client paid a sales commission—typically $100. The brokers fully disclosed that sales commission, and the client's copy of the transaction ticket reflected the commission. Out of that sales commission, Hampton Porter paid its brokers a predetermined percentage, typically 50%, for a resulting regular commission of $50. As an incentive to the brokers to push *house stocks*, however, Hampton Porter offered a "bonus commission," which Hampton Porter paid the brokers in addition to the regular commission. The bonus commission typically amounted to 5% of the purchase price of the house stock. The bonus commissions were paid directly by Hampton Porter, not by the clients. Neither the brokers nor the transaction tickets disclosed to clients the existence of bonus commissions. In summary, for a purchase of non-house stock, a broker received $50; but for a purchase of house stock, a broker received $50 plus 5% of the purchase price.

Two simple examples illustrate the dramatic difference between the broker's commission on a client's purchase of a non-house stock and the broker's commission on a client's

---

[2]The trial also included charges against Defendant Michael Losse. The jury acquitted him on all counts, and he is not a party to this appeal. The term "Defendants" refers to the four Defendants who bring these consolidated appeals.

[3]Defendants' use of the term "house stock" is not entirely consistent. For purposes of this opinion, we use the term to encompass all four stocks that generated bonus commissions for Hampton Porter's brokers.

purchase of a house stock. Suppose that a client bought
$30,000 worth of a non-house stock and that Hampton Porter
charged its standard $100 sales commission. The client would
pay $30,100, and the broker would receive a $50 commission.
Now assume instead that a client bought $30,000 worth of a
house stock and that Hampton Porter charged its standard
$100 sales commission. The client again would pay $30,100.
But this time, the broker would receive the $50 sales commis-
sion *plus* a bonus commission of $1,500. In summary, a cli-
ent's purchase of $30,000 worth of stock would result in
either a total commission of $50 or a total commission of
$1,550—depending only on whether the stock purchased was
a house stock.[4]

Additionally, bonus commissions could be lost. Generally
speaking, if the client sold shares of a house stock, the broker
would lose the bonus commission that he or she had earned
on the original purchase of the house stock. The brokers
attempted to avoid the loss of the bonus commission in sev-
eral ways. First, and most simply, the brokers dissuaded the
client from selling the house stock. Second, if the broker
could find another client to purchase the house stock, he or
she executed a "cross-trade" between clients. Although the
specifics of the transaction were unknown to the two clients,
the selling client sold his or her shares of the house stock to
the purchasing client. In this way, the total number of shares
owned by Hampton Porter clients as a group would be unaf-
fected. Third, in some instances, the broker executed unautho-
rized purchases of the house stock by another, unsuspecting
client.

---

[4]The difference in commission becomes even more stark as the pur-
chase amount increases. It was not unusual for a client of Hampton Porter
to purchase hundreds of thousands of dollars worth of stock, resulting in
total commissions of tens of thousands of dollars for house-stock
purchases—compared to only $50 if the broker sold the same amount of
a non-house stock.

The government introduced overwhelming and uncontested evidence that Defendants knowingly received bonus commissions. Several of Defendants' former clients testified that Defendants used high-pressure sales tactics to persuade them to buy house stocks and that Defendants strongly discouraged the sale of house stocks. They testified that, had they known of the bonus commissions, they would not have bought the house stocks. They also testified to unauthorized purchases in their accounts and other illicit behavior by Defendants, such as lying and failing to carry out their express instructions. Finally, the government introduced uncontested evidence that all Defendants except Laurienti regularly executed trades without the necessary licenses.

The jury found Defendants guilty on all counts. Although the jury convicted each Defendant of more than one count, the district court imposed only one sentence by operation of U.S.S.G. § 3D1.2(d), which mandates that "counts involving substantially the same harm shall be grouped together." The district court imposed sentences ranging from 30 months' imprisonment to 52 months' imprisonment. Each sentence is below the corresponding Guidelines range. The district court also ordered that each Defendant pay restitution in amounts ranging from approximately $300,000 to approximately $2.7 million. In these consolidated appeals, Defendants timely appeal their convictions and their sentences.

## DISCUSSION

I.  *Challenges to the Convictions*

### A.  *Duty to Disclose Bonus Commissions*

Section 10(b) of the Securities Exchange Act of 1934 states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumental-

ity of interstate commerce or of the mails, or of any
facility of any national securities exchange—

. . . .

(b) To use or employ, in connection with the pur-
chase or sale of any security registered on a national
securities exchange or any security not so registered,
or any securities-based swap agreement (as defined
in section 206B of the Gramm-Leach-Bliley Act),
any manipulative or deceptive device or contrivance
*in contravention of such rules and regulations as the
Commission may prescribe* as necessary or appropri-
ate in the public interest or for the protection of
investors.

15 U.S.C. § 78j (emphasis added). The relevant SEC regula-
tion, Rule 10b-5, states:

It shall be unlawful for any person, directly or
indirectly, by the use of any means or instrumental-
ity of interstate commerce, or of the mails or of any
facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to
defraud,

(b) To make any untrue statement of a material
fact or to omit to state a material fact necessary in
order to make the statements made, in the light of the
circumstances under which they were made, not mis-
leading, or

(c) To engage in any act, practice, or course of
business which operates or would operate as a fraud
or deceit upon any person, in connection with the
purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Violations of section 10(b) and Rule 10b-5 can give rise to both civil liability and criminal liability. *See, e.g., Chiarella v. United States*, 445 U.S. 222 (1980) (criminal charges); *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931 (9th Cir. 2009) (per curiam) (civil class action brought by individual investors); *SEC v. Talbot*, 530 F.3d 1085 (9th Cir. 2008) (civil charges brought by the SEC); *see also* 15 U.S.C. § 78ff (imposing criminal liability for certain violations of securities law). Here, the government brought criminal charges for willful violations of section 10(b) under 15 U.S.C. § 78ff(a). Count One of the indictment alleges that Defendants conspired to commit securities fraud, in violation of 18 U.S.C. § 371. The individual counts allege that Defendants individually acted, or aided and abetted an act, in furtherance of the fraudulent scheme in connection with specified client purchases of house stocks.

The government's overarching theory of the case is that Hampton Porter's owners, its managers, and Defendants conspired to engage in, and did engage in, a "pump and dump" scheme. Hampton Porter artificially inflated the price of house stocks by fraudulently selling shares to unwitting clients, the owners and managers benefitted by selling their shares of house stocks at an artificially high price, and the brokers benefitted by collecting undisclosed bonus commissions.

1. *Viable Legal Theory*

[1] One of the government's theories of guilt was that Defendants, with intent to defraud, failed to disclose to their clients their receipt of bonus commissions on purchases of the four house stocks. Defendants do not dispute, and overwhelming evidence supports the finding, that they received bonus commissions and that they failed to disclose the bonus commissions to their clients. Instead, Defendants argue that their

failure to disclose is not a legal violation of any sort, especially not a criminal violation. Whether, and in what circumstances, a broker's failure to disclose bonus commissions can give rise to criminal liability is a pure question of law. "We review questions of law *de novo*." *United States v. Green*, 592 F.3d 1057, 1063 (9th Cir. 2010).

Before addressing that legal question, however, it is important to note that Defendants were not necessarily charged with their failure to disclose the bonus commissions. To prove the conspiracy count, the government had to show that a conspiracy to defraud existed, that a particular defendant knew the purposes of the conspiracy and joined the conspiracy, and that some member of the conspiracy (including the owners and managers) performed an overt act in furtherance of the conspiracy. *United States v. Boone*, 951 F.2d 1526, 1543 (9th Cir. 1991). The conspiracy at issue here is the overall "pump and dump" scheme. Defendants did not challenge, and overwhelming evidence supports the finding, that the conspiracy existed and that at least one member of it performed an overt act.

Defendants' primary defense was that they had not joined the conspiracy.[5] Even if the jury had been instructed that disclosure of bonus commissions is not required by any law, a reasonable juror nevertheless could have concluded that Defendants intentionally acted contrary to the interests of their clients by pushing house stocks as part of a fraudulent scheme to line Defendants' pockets without regard for the interests of their clients. The undisclosed bonus commissions —even if not independent criminal conduct—are nevertheless

---

[5]The elements of the conspiracy itself and the overt act were common to all *five* Defendants, and the evidence on those elements was uncontested and overwhelming. Because the jury convicted the four Defendants who join in this appeal, but acquitted Defendant Losse, it apparently found that the two common elements were met, but that the defendant-specific element—agreement to the conspiracy—was met in all cases except Defendant Losse's.

circumstantial evidence of Defendants' agreement to join the
conspiracy. In short, even if the failure to disclose was per-
fectly legal in all circumstances, the government still met its
burden to establish a conspiracy.[6]

In the final analysis, however, the government offered evi-
dence of Defendants' failure to disclose the bonus commis-
sions not only as circumstantial evidence of their agreement
to join and carry out the conspiracy but also as an independent
violation of Rule 10b-5. Because that theory indisputably was
one of the government's theories of guilt, Defendants' chal-
lenges to that theory must be addressed, even though the gov-
ernment did not *have to* advance that theory of guilt and even
though the government also presented *other* theories of guilt.

We turn, then, to whether, and (if so) in what circum-
stances, a broker's failure to disclose bonus commissions can
give rise to criminal liability. Defendants argue that there is
*never* a duty to disclose bonus commissions. In response, the
government does not assert that a broker *always* owes a duty
to disclose bonus commissions. Instead, it argues that the fail-
ure to disclose the bonus commissions, coupled with Defen-
dants' intent to defraud, constituted criminal conduct if, but
only if, (1) Defendants had a fiduciary or similar relationship
of trust and confidence with their clients and (2) the failure to
disclose the bonus commissions was a "material" omission.

---

[6]A similar analysis applies to the individual counts. To prove the indi-
vidual counts, the government had to show, among other things, that the
defendant violated one of the prongs of Rule 10b-5 willfully and with the
intent to defraud. Once the jury found that Defendants had joined the
"pump and dump" conspiracy, it easily could conclude that Defendants'
role in the individual purchases of house stock was, for instance, an
employment of the overall scheme to defraud, in violation of Rule 10b-5.
Once Defendants agreed to the "pump and dump" scheme, their fraudulent
conduct in selling the stock to unsuspecting clients constituted a securities
violation because it was in furtherance of, and part of, the overall scheme
to defraud. Again, the undisclosed bonus commissions—even if not crimi-
nal conduct—are nevertheless circumstantial evidence of Defendants'
intent to mislead their customers.

We begin with the Supreme Court's discussion of the boundaries of criminal liability for a person trading on "inside information." In *Chiarella*, 445 U.S. at 224, the defendant gleaned confidential information about third-party corporations through his job as a printer in New York. Capitalizing on this "inside information," the defendant made substantial profits by trading in the stock market. *Id.* The government indicted the defendant for violations of section 10(b) and Rule 10b-5, *Chiarella*, 445 U.S. at 225, the same statute and regulation at issue here. The district court instructed the jury to convict the defendant "if it found that [the defendant] willfully failed to inform sellers of target company securities that he knew of a forthcoming takeover bid that would make their shares more valuable." *Id.* at 226. The Supreme Court granted certiorari "to decide whether silence in such circumstances violates § 10(b)," characterizing the issue as "whether silence may constitute a manipulative or deceptive device" under section 10(b). *Id.*

In a footnote, the Court noted that the defendant was charged only with violations of subsections (a) and (c) of Rule 10b-5, and not subsection (b) of the Rule. *Chiarella*, 445 U.S. at 225 n.5. Subsections (a) and (c) of Rule 10b-5 prohibit fraudulent devices, schemes, acts, or practices. Subsection (b) of Rule 10b-5 prohibits the telling of material lies and prohibits the telling of material half-truths, where the speaker "omit[s] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." In *Chiarella*, because the defendant had not made *any* statements to the sellers of the stocks—and, a fortiori, no misleading or false statements —the government did not charge the defendant with a violation of subsection (b). 445 U.S. at 225 n.5.

Addressing the facts of that case, the Court held that, "[w]hen an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." *Id.* at 235. Borrowing from the Restatement (Second) of Torts, the Court

held that "the duty to disclose [material information] arises when one party has information 'that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.' " *Id.* at 228 (alterations in original) (quoting Restatement (Second) of Torts § 551(2)(a) (1976)). In holding that the defendant had no duty to speak, the Court found persuasive that the defendant "was not [the sellers'] agent, he was not a fiduciary, he was not a person in whom the sellers had placed their trust and confidence. He was, in fact, a complete stranger who dealt with the sellers only through impersonal market transactions." *Id.* at 232-33.

[2] In conclusion, under *Chiarella*, a party has a duty to disclose material "inside information" to another party only if there is a fiduciary relationship or a similar relationship of trust and confidence between the parties—at least with respect to alleged violations of subsections (a) and (c) of Rule 10b-5.

[3] In *United States v. Szur*, 289 F.3d 200, 211 (2d Cir. 2002), the Second Circuit applied the general *Chiarella* rule to the specific context here: a broker's failure to disclose commissions. The Second Circuit held that, "when dealing with a claim of fraud based on material omissions, it is settled that a duty to disclose 'arises [only] when one party has information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.' " *Id.* (alteration in original) (quoting *Chiarella*, 445 U.S. at 228). That court approved of the following jury instruction given by the district court, which stated in pertinent part:

Whether a fiduciary relationship exists is a matter of fact for you, the jury, to determine. At the heart of the fiduciary relationship lies reliance and de facto control and dominance . . . . One acts in a fiduciary capacity when the business with which he or she transacts, or the money or property which he or she

handles, is not his or her own or for his or her own
benefit, but for the benefit of another person, as to
whom he or she stands in a relation implying and
necessitating great confidence and trust on the one
part and a high degree of good faith on the other
part.

*Id.* at 210.

In *Skelly*, 442 F.3d at 96-99, the Second Circuit in another
criminal case again addressed the issue raised by the parties
here: whether a stock broker has a duty to disclose bonus
commissions. That court again approved of the jury instruc-
tion given in *Szur* and made clear that a proper jury instruc-
tion in this context must include "the elements of 'reliance
and de facto control and dominance.' " *Id.* at 99. Concerning
when a fiduciary duty arises, the court elaborated that,

while there is no general fiduciary duty inherent in
an ordinary broker/customer relationship, a relation-
ship of trust and confidence does exist between a
broker and a customer with respect to those matters
that have been entrusted to the broker. Most com-
monly, this relationship exists in situations in which
a broker has discretionary authority over the custom-
er's account, but we have recognized that particular
factual circumstances may serve to create a fiduciary
duty between a broker and his customer even in the
absence of a discretionary account.

*Id.* at 98 (citations and internal quotation marks omitted).

[4] We agree with the Second Circuit that, when a relation-
ship of trust and confidence exists between a broker and a cli-
ent, a broker must disclose all facts material to that
relationship. We therefore adopt the Second Circuit's
approach and hold that the general *Chiarella* rule applies to
a broker's duty to disclose material information: A broker has

a duty to disclose material information about a stock purchase
if the broker and client have a fiduciary relationship or a simi-
lar relationship of trust and confidence. (As a convenient
shorthand, we will refer to "a fiduciary relationship or a simi-
lar relationship of trust and confidence" as "a trust relation-
ship.")

Although *Chiarella* concerned the use of "inside informa-
tion," the foundation for the Supreme Court's rule was the
general law of torts and, more specifically, the rule that per-
sons in trust relationships have greater duties to each other
than do persons involved in arms-length transactions. The
Second Circuit's holding that this general rule applies to the
situation at issue here logically applies that rule. Defendants
do not make any arguments,[7] and we can think of none, why
the general *Chiarella* rule should not apply here. Accordingly,
we reject Defendants' argument that a broker never has a duty
to disclose bonus commissions.

Our holding today is somewhat more limited than the Sec-
ond Circuit's approach, which reached all of Rule 10b-5. As
noted above, the Supreme Court's opinion in *Chiarella*
addressed whether silence could constitute a manipulative

---

[7]Defendants quote from a civil case, *Benzon v. Morgan Stanley Dis-
tribs., Inc.*, 420 F.3d 598, 612 (6th Cir. 2005), in which the Sixth Circuit
held that the defendant brokers did not have a duty to disclose to their cli-
ents that they earned more from selling Morgan Stanley mutual funds than
from selling other mutual funds. In this regard, the Sixth Circuit held that
no duty arose because "Plaintiffs have pointed [to] no statutory or regula-
tory requirement that Defendants disclose that their brokers earn more for
selling their own mutual funds. Because Plaintiffs have failed to identify
the source of Defendants' alleged duty to disclose," the court held that no
duty existed. *Id.* At no point in the opinion does the Sixth Circuit mention
the potential for a duty arising from a trust relationship; it appears that the
plaintiffs simply did not argue that the brokers had a trust relationship with
the plaintiffs that would have given rise to the duty to disclose. Accord-
ingly, *Benzon* is consistent with the Supreme Court's decision in *Chia-
rella*, the Second Circuit's approach in cases such as *Szur* and *Skelly*, and
our approach.

device when a defendant is charged under *subsections (a) and (c)* of Rule 10b-5. The defendant in that case had not made any statements to anyone, so the Court naturally addressed whether the law imposed a duty to speak. By contrast, where, as here, a defendant is charged under *subsection (b)* of Rule 10b-5 and has made many statements to his clients, criminal liability may encompass the failure to disclose bonus commissions even in the absence of a trust relationship. Under subsection (b) of Rule 10b-5, even in the absence of a trust relationship, a broker cannot affirmatively tell a misleading half-truth about a material fact to a potential investor. That requirement is entirely consistent with the Supreme Court's holding that there can be no fraud absent a duty to speak: The duty to disclose in these circumstances arises from the telling of a half-truth, independent of any responsibilities arising from a trust relationship.

[5] But we need not decide whether that theory of guilt is viable, and we expressly leave the question open for another day, because the government has not advanced that argument, either on appeal or before the district court. Additionally, the government has not distinguished among the subsections of Rule 10b-5; it charged Defendants with violating all three subsections, and it did not tailor its proposed jury instructions along the lines just described. Finally, the government did not identify which specific statements made by Defendants would qualify as misleading half-truths such that the bonus commissions would constitute a material omission under subsection (b). *See Skelly*, 442 F.3d at 97 ("[O]therwise truthful statements made by [a broker] about the merits of a particular investment are not transformed into misleading 'half-truths' simply by the broker's failure to reveal that he is receiving added compensation for promoting a particular investment."). Accordingly, we limit our holding to the general rule that, if a broker and a client have a trust relationship, as described by the Second Circuit, then the broker has an obligation to disclose all facts material to that relationship.

[6] On the other hand, we emphasize that, even in a trust relationship, a broker is required to disclose only *material* facts. As the Second Circuit has held, materiality is defined by the nature of the trust relationship between the clients and the brokers: "This relationship places an affirmative duty on brokers to use reasonable efforts to give the customer information relevant to the affairs that have been entrusted to them." *Szur*, 289 F.3d at 211 (brackets and internal quotation marks omitted). In the context at issue here—the purchase of stocks —we see no difference between that definition of materiality and the definition of materiality related to affirmative misstatements or half-truths: "For securities fraud, a statement is material if there is a substantial likelihood that a reasonable investor would consider it important in making a decision." *United States v. Tarallo*, 380 F.3d 1174, 1182 (9th Cir. 2004).

[7] In deciding whether to buy a given stock, a reasonable investor would consider it important that, in contrast to the purchase of most stocks, the broker would receive a 5% commission from the purchase of this particular (house) stock. At trial, every former client who testified said that he or she would not have bought the house stocks had he or she known about the bonus commissions. We therefore reject Defendants' argument that the bonus commissions are immaterial as a matter of law. *See Press v. Quick & Reilly, Inc.*, 218 F.3d 121, 130 (2d Cir. 2000) (holding that extra commissions on the sale of particular securities products represent a "conflict of interest" that is "material"); *Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1172 (2d Cir. 1971) (holding that "failure to inform the customer fully of its possible conflict of interest, in that it was a market maker in the securities which it strongly recommended for purchase by [the plaintiff], was an omission of material fact in violation of Rule 10b-5"); *see also Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 242 (2d Cir. 1985) ("Commissions that defendants receive on the CDs they sell to the public are relevant and must be disclosed.").

We recognize that brokerages often have complicated compensation systems and that brokers sometimes receive additional compensation on client purchases of particular securities products. Our holding today does not mean that all compensation arrangements are necessarily "material" even within a trust relationship and therefore could lead to criminal (and civil) liability. For example, de minimis variations in compensation among different securities products would be immaterial as a matter of law. *See Szur*, 289 F.3d at 211-12 (holding that some information "borders on insignificant minutia, the omission of which could never be actionable for fraud" (internal quotation marks omitted)). Additionally, courts have recognized that, depending on the circumstances, even minimal disclosures can meet the broker's obligation to disclose. *See, e.g., Benzon*, 420 F.3d at 612 (holding that the brokers met their disclosure obligations because of a prospectus disclosure that brokers "*may* receive different compensation for selling each Class of share"); *Press*, 218 F.3d at 130 (holding that the brokers satisfied their disclosure obligations because of "general disclosures" in fund prospectuses and "Statements of Additional Information" filed with the SEC by the managers of the money market funds). The bonus commissions here fall into neither category. The difference between a commission of $50 on the sale of a non-house stock and a commission of thousands of dollars on the sale of a house stock is not a de minimis difference in compensation. And Defendants here did not disclose the bonus commissions in any way whatsoever.

[8] Finally, Defendants argue that, even if case law now has established that a broker sometimes has a duty to disclose commissions, their convictions violate the "fair warning requirement, derived from the Ex Post Facto Clause and the Due Process Clause, [which] requires that criminal laws specify the scope of criminal laws *in advance* and *with clarity*." Appellants' Joint Opening Br. at 26. We are unpersuaded. "Retroactive application of unforeseen expansions of substantive law violate[s] due process because an ordinary person is

not able to conform his or her conduct to what the law requires." *United States v. Miranda-Guerena*, 445 F.3d 1233, 1237 (9th Cir. 2006); *see also McSherry v. Block*, 880 F.2d 1049, 1052-58 (9th Cir. 1989) (discussing the "fair warning" requirement). The requirement to disclose substantial bonus commissions to a client in a trust relationship flows naturally from the Supreme Court's *Chiarella* decision in 1980, as the Second Circuit held, without elaboration, in *Szur* in 2002; it cannot be characterized as an "unforeseen expansion[ ] of substantive law." *Miranda-Guerena*, 445 F.3d at 1237. Furthermore, the failure to disclose is illegal only if done with intent to defraud; it cannot be said that "an ordinary person is not able to conform his or her conduct to" acting without fraudulent intent. *Cf. Screws v. United States*, 325 U.S. 91, 102 (1945) ("The requirement that the act must be willful or purposeful may not render certain, for all purposes, a statutory definition of the crime which is in some respects uncertain. But it does relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware."). We hold that Defendants' convictions do not violate the constitutional "fair warning" requirement.

### 2. *Jury Instructions*

[9] Defendants argue, in the alternative, that the district court committed reversible error by failing to instruct the jury on the government's burden to prove a trust relationship between Defendants and their clients. Defendants accurately observe that the district court did not give a jury instruction on the trust relationship requirement. The jury instructions as a whole permitted a conviction on the theory, among others, that Defendants failed to disclose the bonus commissions with the intent to defraud—but without requiring the jury to find that a trust relationship existed between Defendants and their clients. With the potential caveat of the subsection (b) argument, discussed above and not advanced by the government, there is no support for a duty to disclose commissions outside

a trust relationship. We therefore hold that the district court erred by failing to give a "trust relationship" jury instruction.

We turn, then, to whether the error is reversible. The parties dispute whether Defendants merely forfeited the argument such that "plain error" review applies or whether Defendants waived the argument outright under the "invited error" doctrine. "Forfeiture is the failure to make a timely assertion of a right, whereas waiver is the 'intentional relinquishment or abandonment of a known right.' Forfeited rights are reviewable for plain error, while waived rights are not." *United States v. Perez*, 116 F.3d 840, 845 (9th Cir. 1997) (en banc) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). "If the defendant has both invited the error, and relinquished a known right, then the error is waived and therefore unreviewable." *Id.* Waiver does not occur when there is "no evidence that [the defendants] considered submitting the [omitted] element to the jury, but then, for some tactical or other reason, rejected the idea." *Id.*; *see also United States v. Tuyet Thi-Bach Nguyen*, 565 F.3d 668, 676 (9th Cir. 2009) (rejecting the government's argument that waiver applied because there was no evidence that the defendant was aware of the omitted element); *United States v. Romm*, 455 F.3d 990, 1004 n.17 (9th Cir. 2006) ("Here, since nothing in the record suggests that Romm or his trial counsel were aware of the element omitted from the jury instructions, invited error does not apply."); *United States v. Burt*, 143 F.3d 1215, 1217 (9th Cir. 1998) (holding that the defendant had not waived the argument because "there is no evidence that the defendant, the government or even the [district] court was aware" of the omitted element). But a defendant waives the right to appeal if the "defendant considered the controlling law, or omitted element, and, in spite of being aware of the applicable law, proposed or accepted a flawed instruction." *Perez*, 116 F.3d at 845. For example, waiver occurs when "the defendant was aware of the omitted element and yet relinquished his right to have it submitted to the jury." *Id.*

Here, the government proposed a correct trust relationship instruction, modeled after the Second Circuit's decision in *Skelly*. Defendant Laurienti affirmatively objected to that instruction, on the patently false ground that no criminal case supported the government's proposed instruction.[8] For reasons never explained on the record, the district judge refused to give the government's proposed instruction, stating only that the instruction "will not be given." The government asked the district court to reconsider its decision. The instruction, after all, ran counter to the government's interest because it required that the government prove *an additional element* beyond a reasonable doubt. Yet again, the district judge responded only that "You've made your record and you're free to argue it[,] but you can't have an instruction regarding it." Defendants remained silent during the colloquy between the government and the district judge. None of them raised the trust relationship issue with the court.

We hold that Defendant Laurienti expressly waived his right to appeal the omitted jury instruction. Defendant Laurienti's objection to the proposed instruction easily demonstrates that he "was aware of the omitted element and yet relinquished his right to have it submitted to the jury." *Perez*, 116 F.3d at 845. Defendant Laurienti concedes, as he must, that he objected to the government's proposed instruction and that all Defendants remained silent when the government reproposed the instruction over the district court's contrary ruling. Defendant Laurienti argues that he nevertheless should be permitted to raise the argument on appeal, because he faced

---

[8]Defendant Laurienti's objection stated: "This instruction is created from whole cloth and [sic] civil and regulatory authorities. There is no statute nor other apposite authority which imposes criminal liability on the grounds advanced. Nor were the accuseds charged with, or arraigned on, any 'breach of fiduciary' charges." In support of its proposed instruction, the government properly cited *Skelly*, the Second Circuit's criminal case. On appeal, all Defendants refer to the proposed instruction as the "*Skelly* instruction."

a "Hobson's choice."[9] Appellants' Joint Reply Br. at 12. Defendants' main legal theory, of course, is that brokers *never* have a duty to disclose, even if there is a trust relationship. Defendant Laurienti argues that, "had the defendants joined in the government's request for the [trust relationship] instruction, they would have forfeited their lead claim of trial error [that there is never a duty to disclose]." Appellants' Joint Reply Br. at 12.

Defendant Laurienti is wrong, because nothing prevents a party from arguing in the alternative. Defendants could have proposed an instruction along the lines of the legal theory they proposed (which they did not) and, at the same time, argued that, if the court rejected Defendants' theory, the court should accept the government's proposed instruction. That line of argument would not have prejudiced Defendants, either before the district court *or* on appeal. And it would ensure that the situation we face now—indisputably incorrect jury instructions—would not have occurred. Instead, Defendants affirmatively argued that erroneous jury instructions should be given and now seek to fault the district court for acquiescing.

On this record, we are convinced that Defendant Laurienti was not careless or ignorant; instead, we hold that he intentionally relinquished his right to challenge the jury instruction.[10]

_____

[9] Defendants briefly argue, in the alternative, that a challenge to an omitted element from a jury instruction can never be waived because it is of constitutional dimension. We squarely rejected that argument in *Perez*, 116 F.3d at 845 n.7.

[10] For this reason, our decision in *United States v. Alferahin*, 433 F.3d 1148 (9th Cir. 2006), is inapposite. In a footnote in *Alferahin*, we held that "[t]he record in this case clearly indicates that Alferahin's attorney did not intentionally relinquish a known right . . . [because] both defense counsel and the district court were operating under a misapprehension of the applicable law." *Id.* at 1154 n.2. We echo the concurrence's sentiment in that case that the majority's explanation inadequately distinguishes *Perez*, because the plain error issue is "more difficult than the majority opinion

As discussed above, the jury instructions given suggested that the failure to disclose bonus commissions was *always* illegal. But the instructions were somewhat ambiguous on this point. And that ambiguity allowed Defendants, during closing argument, to make their primary argument to the jury, even though it is a legal argument: Brokers *never* have an obligation to disclose bonus commissions. Nothing in the jury instructions, as given, expressly contradicted that theory. Had the district court given the government's proposed instruction, however, that instruction would have fatally undermined Defendants' argument that there is never a duty, because the proposed instruction affirmatively states that there is a duty to disclose *when there is a trust relationship*. In other words, the proposed instruction would have removed the ambiguity and would have contradicted Defendants' main argument.

[10] In conclusion, we hold that Defendant Laurienti waived his right to challenge the district court's failure to give the "trust relationship" jury instruction. With respect to the other three Defendants, the issue of waiver versus forfeiture requires a bit more explanation. At a pre-trial hearing, the district court instructed Defendants that, in a joint trial, the court would consider all objections raised by any one Defendant as having been raised by all Defendants, unless one or more Defendants opted out. Defendants agreed, and they do not challenge that general policy on appeal.

[11] No Defendant opted out of Defendant Laurienti's objection to the government's proposed jury instruction. Effectively, therefore, all Defendants joined the objection. The government argues that all Defendants, and not just

---

suggests." *Alferahin*, 433 F.3d at 1162 (Berzon, J., concurring in part). In any event, we are unpersuaded that our record-specific decision in *Alferahin* applies here. Defendant Laurienti's intentional, affirmative objection to the proposed jury instruction clearly illustrates that he was not simply operating under a misapprehension of the applicable law.

Defendant Laurienti, thereby waived the right to challenge the omitted jury instruction. At oral argument, Defendants' counsel argued that we should not hold that the three other Defendants waived the right to challenge the omitted jury instruction, because silence cannot constitute waiver. We disagree for three reasons.

First, we have not held that silence can *never* constitute waiver. Because the court placed Defendants clearly on notice of the effect of their silence, silence very well might constitute waiver. *See Perez*, 116 F.3d at 845 ("We do not mean to suggest that a defendant may have jury instructions reviewed for plain error merely by claiming he did not know the instructions were flawed. What we are concerned with is evidence in the record that the defendant was aware of, *i.e.*, knew of, the relinquished or abandoned right.").

Second, we decline to accept an argument that might promote gamesmanship on the part of joint defendants. Defendants in similar circumstances could spread objections among themselves so as to defeat waiver for all objections.

Third, and most important, the record demonstrates without a doubt that all Defendants intentionally shared in the strategy that resulted in the waiver expressed by Defendant Laurienti's objection to the government's proposed jury instruction. In other words, taken in context the other Defendants' silence here was conscious, active agreement, not merely passivity or failure to comment.

[12] For those reasons, we hold that all Defendants waived the right to challenge the district court's failure to give the "trust relationship" jury instruction. Accordingly, we do not examine that issue on the merits.

B.   *"Unlawful Sales Practices" in the Indictment*

Defendants next challenge, as unnecessary surplusage, the indictment's use of the word "unlawful" in relation to Defen-

dants' receipt of bonus commissions. Under the heading "The Scheme to Defraud," the indictment includes the following paragraph:

> Defendants and their co-conspirators employed a variety of *unlawful sales practices*, including:
>
> (a) *paying brokers undisclosed special incentive compensation to sell particular stocks*;
>
> (b) using high-pressure tactics and false statements to induce customers to buy stocks;
>
> (c) recommending stocks without determining customers' suitability for purchasing thinly-traded speculative low-priced securities;
>
> (d) making false and misleading statements to persuade customers not to sell particular stocks;
>
> (e) failing to take and execute customer orders to sell particular stocks;
>
> (f) engaging in so-called "cross trades";
>
> (g) making unauthorized purchases in customers' accounts;
>
> (h) converting customer cash account holdings to margin without authorization;
>
> (i) placating customers with false promises of "make-up" trades;
>
> (j) opening and trading in customer accounts without an active brokers license, by using the registered representative numbers of other brokers.

(Emphases added.)

At a pre-trial hearing on motions in limine, Defendants requested that the word "unlawful" be redacted. Consistent with their general legal theory, Defendants argued that brokers never have a duty to disclose bonus commissions and that the challenged sections of the indictment must be redacted as prejudicial. In response, the government admitted that undisclosed bonus commissions are not *always* unlawful. The government argued that, in the context of this case, however, the actions were part of an overall scheme to defraud and therefore constituted criminal behavior. The government expressly conceded that a failure to disclose bonus commissions is illegal only if a trust relationship exists. The government stated that it intended to prove the existence of just such a trust relationship at trial. The district judge issued his ruling with unhelpful brevity: "All right. The motion to redact is denied."

[13] Federal Rule of Criminal Procedure 7(d) states: "Surplusage. Upon the defendant's motion, the court may strike surplusage from the indictment or information." The advisory committee's notes state that "[t]his rule introduces a means of protecting the defendant against immaterial or irrelevant allegations in an indictment or information, which may, however, be prejudicial." *Id.*, advisory committee's notes. "Denial of a motion to strike surplusage is reviewed for an abuse of discretion." *United States v. Terrigno*, 838 F.2d 371, 373 (9th Cir. 1988). "The purpose of a motion to strike under Fed. R. Crim. P. 7(d) is to protect a defendant against prejudicial or inflammatory allegations that are neither relevant nor material to the charges." *Id.* (internal quotation marks omitted).

[14] The characterization of the sales practices as unlawful was relevant, because the government sought to prove that, as conducted by Defendants (with an intent to defraud and in violation of trust relationship duties), the practices were indeed unlawful. *See id.* (holding that the indictment's refer-

ence to the defendant's issuing checks "willfully" was relevant because the government sought to prove that fact). Even if the use of the word "unlawful" could be considered prejudicial, we hold that the district court nevertheless did not abuse its discretion because the allegation was relevant. *See id.*; *accord United States v. Hedgepeth*, 434 F.3d 609, 612 (3d Cir. 2006).

## C. *Failure to Allow Paul Meyer to Testify as an Expert*

Defendants argue that the district court abused its discretion by not permitting defense witness Paul Meyer to testify as an expert. We review for abuse of discretion the district court's decision not to permit expert testimony. *United States v. Cohen*, 510 F.3d 1114, 1123 (9th Cir. 2007). Even if the district court abused its discretion, we review any error for harmlessness. " 'Under our test for nonconstitutional error, which we apply to errors as to the admissibility of expert testimony, we must reverse unless it is more probable than not that the error did not materially affect the verdict.' " *Id.* at 1127 (quoting *United States v. Rahm*, 993 F.2d 1405, 1415 (9th Cir. 1993)).

Defendants offered Meyer as an expert on the securities industry. Meyer had worked in a wide variety of positions for 26 years in the securities industry—all of that time at a large firm, Smith Barney, and its predecessors. He had recently retired and started his own expert witness consulting business. He had never testified as an expert in federal court, but he had testified at several administrative proceedings and once in state court. He did not have any specialized degrees and had not written any publications.

The district court denied Defendants' request that Meyer be permitted to testify as an expert witness. The court held that Meyer could testify as a "summary" witness but that he could not testify to ultimate conclusions. When pressed on the limits of permissible testimony, the court held that it would issue

question-specific rulings as Meyer testified. When Meyer testified, the district court permitted many of Defendants' questions, but it also sustained some of the government's objections.

**[15]** To the extent that Defendants argue that the district court abused its discretion by failing to describe Meyer as an "expert" in front of the jury, we disagree. The determination that a witness is an expert is not an express imprimatur of special credence; rather, it is simply a decision that the witness may testify to matters concerning "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702. For example, the Ninth Circuit Manual of Model Criminal Jury Instructions includes an instruction admonishing the jury to consider expert witness testimony "like any other testimony." 9th Cir. Crim. Jury Instr. 4.17. It is the *scope* of testimony excluded by the district court that we must examine, not the court's nominal decision not to *label* Meyer an "expert."

**[16]** "If the evidence could have been excluded under either [Federal Rule of Evidence 702 or 704], the district court did not abuse its discretion." *United States v. Morales*, 108 F.3d 1031, 1035 (9th Cir. 1997) (en banc). The government does not argue that Meyer's testimony could have been excluded under Federal Rule of Evidence 704. The scope and meaning of the rules of the National Association of Securities Dealers ("NASD"), for example, is a proper subject of expert testimony. *See Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 803 F.2d 454, 461 (9th Cir. 1986) ("Testimony concerning the rules of the New York Stock Exchange and of the [NASD] was highly relevant and far from prejudicial because the rules reflect the standard to which all brokers are held . . . . Exclusion was an abuse of discretion." (citation and internal quotation marks omitted)). The government argues instead that Meyer did not meet the threshold test of Rule 702.

Federal Rule of Evidence 702 states:

If scientific, technical, or other specialized knowl-
edge will assist the trier of fact to understand the evi-
dence or to determine a fact in issue, a witness
qualified as an expert by knowledge, skill, experi-
ence, training, or education, may testify thereto in
the form of an opinion or otherwise, if (1) the testi-
mony is based upon sufficient facts or data, (2) the
testimony is the product of reliable principles and
methods, and (3) the witness has applied the princi-
ples and methods reliably to the facts of the case.

We have held:

Rule 702 assigns to the district court the role of
gatekeeper and charges the court with assuring that
expert testimony "rests on a reliable foundation and
is relevant to the task at hand." The gatekeeper role
"entails a preliminary assessment of whether the rea-
soning or methodology underlying the testimony is
. . . valid and of whether that reasoning or methodol-
ogy properly can be applied to the facts in issue."

*United States v. Hermanek*, 289 F.3d 1076, 1093 (9th Cir.
2002) (citation omitted) (quoting *Daubert v. Merrell Dow
Pharms., Inc.*, 509 U.S. 579, 592-93, 597 (1993))

[17] The government argues that Meyer was not qualified
as an expert because his opinions were not supported by any
methodology other than his own work experience. But the
government does not explain why Meyer's experience was
not sufficient in this regard. It is true that Meyer's experience
was only at a large firm, that he had little experience with the
types of stocks at issue in this case, and that he had never
heard of the term "house stock." But those facts do not under-
mine his general knowledge of the NASD rules and his gen-
eral knowledge of the industry as a whole. Although the
district court has a gatekeeping function, the district court
here abused its discretion by sustaining some of the govern-

ment's objections, particularly with respect to questions about the NASD rules.

[18] We have examined the record carefully, however, and we conclude that the district court's errors were harmless. Unlike in many cases, where the district court prohibits *all* testimony by a proffered expert, the district court here permitted testimony by Meyer on a wide range of topics and sustained objections only to a limited set of questions. *See, e.g.*, *Cohen*, 510 F.3d at 1126 (holding that "the best way for the district court to have insured the exclusion of the potentially inadmissible aspects of Dr. Roitman's testimony was not to bar him from testifying altogether, but to sustain the government's objections to particular questions"); *United States v. Finley*, 301 F.3d 1000, 1018 (9th Cir. 2002) (holding that the exclusion of expert testimony was not harmless because, in part, "the [district] court excluded the entire testimony" of the proffered expert). Most of the excluded testimony here pertained to the NASD rules and to Defendants' failure to disclose bonus commissions. As an initial matter, we note that Meyer was permitted to testify to a large extent on those topics, even though some questions were disallowed. Even if Meyer had testified in response to all questions and even if his testimony had fully convinced the jury that the failure to disclose bonus commissions was a common practice in the industry and consistent with NASD rules, the government introduced strong and convincing evidence of many other theories of guilt. Our examination of the record does not reveal any other excluded subject area of importance, and Defendants' counsel identified none when pressed at oral argument. *Cf. Cohen*, 510 F.3d at 1127 (holding that exclusion of expert testimony was not harmless because it was " 'essential to the defense' " (quoting *Finley*, 301 F.3d at 1018)).

In summary, we are persuaded that "it is more probable than not that the error did not materially affect the verdict." *Id.* (internal quotation marks omitted). The district court's errors were harmless.

D.   *Guilt-Assuming Hypotheticals*

Defendants argue that the government used improper "guilt-assuming hypotheticals" during its direct examination of government fact witnesses and during its cross-examination of Defendant Laurienti's character witnesses. Defendants argue that, under this court's decision in *United States v. Shwayder*, 312 F.3d 1109, 1120-21 (9th Cir. 2002), the government's questions violated Defendants' right to due process. We review for abuse of discretion the district court's rulings on the scope of questioning. *United States v. Larson*, 495 F.3d 1094, 1101-02 (9th Cir. 2007) (en banc).

We have held that guilt-assuming hypotheticals are impermissible in the context of the government's cross-examination of a defendant's *character* witnesses. *Shwayder*, 312 F.3d at 1120-21. That rule derives from the fact that, when a character witness is asked a guilt-assuming hypothetical, the answer "can have only negligible probative value as it bears on the central issue of guilt." *Id.* at 1120 (internal quotation marks omitted). Consistent with our holding, the district court *sustained* Defendant Laurienti's objections to the government's guilt-assuming hypotheticals posed to his character witnesses.

[19] With respect to the government's *fact* witnesses, however, there appears to be no support for the proposition that the government cannot ask its own fact witnesses otherwise relevant questions that may have a guilt-assuming element. The government's questions in this case were plainly relevant and probative: In order to establish materiality of Defendants' actions, the government asked questions such as, "If you had known prior to purchasing [a house stock] that Hampton Porter prevented or discouraged their brokers from allowing their clients to sell their shares of [the house stock], would you have purchased the [shares of the house stock]?" Because those questions have much more than "negligible probative value as it bears on the central issue of guilt," *id.*, our primary concern with respect to character witnesses simply does not

apply. We therefore hold that the district court did not abuse its discretion by permitting the government's questioning of its own fact witnesses. *See United States v. Jennings*, 487 F.3d 564, 581-82 (8th Cir. 2007) (holding that, unlike with respect to character witnesses, it is generally permissible to ask guilt-assuming hypotheticals of fact witnesses to prove materiality); *see also United States v. Kellogg*, 510 F.3d 188, 196 (3d Cir. 2007) (distinguishing between opinion character witnesses and reputation character witnesses and holding that "there is nothing inherent in guilt-assuming hypotheticals, in the abstract, that makes them unfairly prejudicial, let alone so prejudicial as to constitute a *per se* violation of due process").

## E.   *Other Challenges to the Convictions*

**[20]** We have considered Defendants' other challenges to their convictions, and we reject those arguments. On de novo review, *United States v. Green*, 592 F.3d 1057, 1063 (9th Cir. 2010), we hold that the district court did not err in failing to give Defendant Laurienti's proposed instruction on knowledge of Rule 10b-5. Defendant Laurienti's argument that knowledge of the Rule is an element of the crime, and not an affirmative defense, is squarely foreclosed by our decision in *Tarallo*, 380 F.3d at 1192.

Reviewing de novo, *United States v. Stewart*, 420 F.3d 1007, 1014 (9th Cir. 2005), we conclude that sufficient evidence supported the convictions of Defendant Laurienti and Defendant Samaria. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (holding that we must affirm if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt).

**[21]** Reviewing for abuse of discretion, *United States v. Pang*, 362 F.3d 1187, 1191-92 (9th Cir. 2004), we hold that the district court properly declined to admit into evidence charts and summaries, because those charts and summaries

UNITED STATES V. LAURIENTI                  8833

were of evidence already admitted into evidence, *see United States v. Wood*, 943 F.2d 1048, 1053 (9th Cir. 1991) (holding that "charts or summaries of testimony or documents already admitted into evidence are merely pedagogical devices, and are not evidence themselves").

[22] On de novo review, *United States v. Chang Da Liu*, 538 F.3d 1078, 1087 (9th Cir. 2008), we hold that the district court did not violate Defendant Montesano's right to due process by admonishing all Defendants to consider carefully whether to testify on their own behalf. Under these circumstances, we are unpersuaded that the admonition became coercive or impermissible simply because, on the previous day, the government filed an ex parte submission (which, we now know, related to Defendant Losse, not Defendant Montesano). *See generally United States v. Jaeger*, 538 F.3d 1227, 1231-33 (9th Cir. 2008) (holding that the district court's admonition was within permissible bounds), *cert. denied*, 129 S. Ct. 941 (2009). We note that Defendant Montesano never inquired about the ex parte submission before deciding whether to testify, even though he had ample opportunity to do so.

[23] On de novo review, *United States v. Valdez-Santos*, 457 F.3d 1044, 1046 (9th Cir. 2006), we hold that venue was proper as to the individual counts against Defendant Laurienti. Although some acts occurred outside the Central District of California, the clients' funds were received by Hampton Porter's clearing house in the Central District, an entirely foreseeable and necessary result of the transactions. *See United States v. Angotti*, 105 F.3d 539, 544 (9th Cir. 1997) (holding that, in criminal prosecutions involving banking transactions, venue is proper where funds are received); *see also United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003) (holding that "venue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue").

[24] Finally, Defendants argue that cumulative errors require reversal. *See United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) ("In some cases, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant."). Here, though, Defendants preserved their claim with respect to only one error—the excluded expert testimony—and we already have explained why that error was harmless.

In conclusion, we affirm Defendants' convictions.

II. *Challenges to the Sentences*

Defendants raise challenges to their sentences that fall into four categories: (1) failure to hold an evidentiary hearing, (2) sentencing adjustments other than amount of loss, (3) loss calculation for purposes of the Sentencing Guidelines, and (4) loss calculation for purposes of restitution. Because the district court erred in calculating loss both for purposes of the Sentencing Guidelines and for purposes of restitution, we vacate Defendants' sentences and restitution orders and remand for resentencing and a recalculation of restitution. In the interest of judicial economy, we address Defendants' other objections to their sentences, because the district court might still make similar findings on remand. Because we vacate the sentences, however, Defendants are entitled to an entirely new sentencing hearing on an open record. *See United States v. Matthews*, 278 F.3d 880, 885 (9th Cir. 2002) (en banc) ("We hold that, as a general matter, if a district court errs in sentencing, we will remand for resentencing on an open record—that is, without limitation on the evidence that the district court may consider.").

We also note at the outset that the district court applied the 1998 edition of the Sentencing Guidelines—the version applicable at the time of the offense—because that version is, overall, more favorable to Defendants. Defendants do not

challenge that choice on appeal. Except as otherwise noted, therefore, all citations to the Sentencing Guidelines are to the 1998 version.

## A. *Evidentiary Hearing*

[25] Defendant Laurienti argues that the district court abused its discretion by denying his motion for an evidentiary hearing on the amount of loss. He cites no authority requiring a district court to hold a hearing in this context, and he does not describe what evidence he would have presented at such a hearing that he did not present in his written submissions. We hold that the district court did not abuse its discretion. *See United States v. Kimball*, 975 F.2d 563, 568 (9th Cir. 1992) ("There is no general right to an evidentiary hearing at sentencing, and where a defendant fails to present any facts in rebuttal to the government's evidence, there need be no new evidentiary hearing." (citation, brackets, and internal quotation marks citation omitted)).

## B. *Sentencing Adjustments Other than Loss*

Defendants challenge four different sentencing adjustments: (1) minor role, (2) number of victims, (3) mass-marketing, and (4) abuse of trust. Before discussing those adjustments, a discussion on the standard of review is in order.

### 1. *Standard of Review*

Two standards of review are clear. We review de novo the district court's interpretation of the Sentencing Guidelines (because it is a pure question of law). *United States v. Kilbride*, 584 F.3d 1240, 1261 (9th Cir. 2009). And we review for clear error the district court's finding of fact (because it is a pure question of fact). *Id.* But it is unclear what standard of review applies to the district court's application of the Sentencing Guidelines to the facts at hand (which typically is

viewed as a mixed question of fact and law). In many opinions, we state, without qualification, that we review for abuse of discretion. *See, e.g., United States v. Loew*, 593 F.3d 1136, 1139 (9th Cir. 2010) ("'We review . . . the district court's application of the Guidelines to the facts for abuse of discretion . . . .'" (quoting *United States v. Garro*, 517 F.3d 1163, 1167 (9th Cir. 2008)), *cert. denied*, 2010 WL 1130267 (U.S. Apr. 19, 2010) (No. 09-9760). In recent years, however, we have "noted an intracircuit conflict as to whether the standard of review for application of the Guidelines to the facts is de novo or only for abuse of discretion." *United States v. Yip*, 592 F.3d 1035, 1038 (9th Cir. 2010) (citing *United States v. Rivera*, 527 F.3d 891, 908 (9th Cir.), *cert. denied*, 129 S. Ct. 654 (2008)); *accord United States v. Berger*, 587 F.3d 1038, 1041 & n.5 (9th Cir. 2009); *United States v. Contreras*, 581 F.3d 1163, 1164 n.2 (9th Cir. 2009), *adopted in relevant part*, 593 F.3d 1135, 1136 (9th Cir. 2010) (en banc) (per curiam); *United States v. Thornton*, 511 F.3d 1221, 1227 n.4 (9th Cir. 2008). We have avoided the question because the standard of review has not changed the outcome: The same result is reached under either standard. *Thornton*, 511 F.3d at 1227 n.4. We join that growing number of cases in declining to reach the issue.

### 2.  *Minor Role Adjustment*

[26] "Based on the defendant's role in the offense, decrease the offense level as follows: . . . (b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels." U.S.S.G. § 3B1.2(b). Defendant Laurienti argues that the district court erred in declining to give him a two-point reduction for a minor role.

> [T]his court has emphasized that any downward role adjustment should be restricted to those cases presenting exceptional circumstances. The defendant bears the burden of proving that he is entitled to a

downward adjustment based on his role in the
offense.

. . . .

Whether the defendant qualifies for either a mini-
mal or minor role adjustment depends on the facts of
the particular case. Thus, a district court's refusal to
grant a defendant's request for role reduction based
on his minimal or minor role should be overturned
only where the refusal was a clearly erroneous deci-
sion. Moreover, where there are two permissible
views of the evidence, the fact-finder's choice
between them can not be clearly erroneous.

*United States v. Awad*, 371 F.3d 583, 591 (9th Cir. 2004)
(citations and internal quotation marks omitted).

Defendant Laurienti certainly was not the mastermind, and
the overall scheme to defraud could have operated without
him. But he joined the conspiracy, and he played a key role
by convincing unwitting clients to purchase house stocks. In
our view, this case does not present "exceptional circum-
stances" in which the district court had no choice but to grant
the two-level downward adjustment.

3.   *Number-of-Victims Enhancement*

"If the offense involved . . . (B) a scheme to defraud more
than one victim, increase by 2 levels." U.S.S.G. § 2F1.1(b)(2).
Defendant Samaria challenges the district court's finding that
there was more than one victim. In *United States v. Galliano*,
977 F.2d 1350, 1354 (9th Cir. 1992), in discussing a challenge
to this enhancement, we held:

Conduct relevant in determining the applicable
Guideline range includes all harm that resulted from
the acts or omissions for which the defendant is

accountable. Among others, Galliano participated in a scheme to defraud California Federal, Valley Bank, VISA, Citibank, and American Express. In addition to the counts of conviction, the district court properly considered the entire fraudulent scheme in concluding that he was involved in a scheme to defraud more than one victim.

(Brackets, citation, and internal quotation marks omitted.)

[27] The conspiracy in this case targeted scores of investors—certainly more than one. Curiously, in view of the conspiracy count, the arguments by both the government and Defendant Samaria assume that the relevant victims for purposes of this enhancement are only those with whom Defendant Samaria personally had some direct connection. But even if one considers only those investors with whom Defendant Samaria had a direct connection, ample evidence supports application of this enhancement. The district court did not err in this respect.

### 4.   *Mass-Marketing Enhancement*

"If the offense was committed through mass-marketing, increase by 2 levels." U.S.S.G. § 2F1.1(b)(3). Defendants argue that the district court erred in imposing that two-level increase. The application notes state:

"Mass-marketing," as used in subsection (b)(3), means a plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to (A) purchase goods or services; (B) participate in a contest or sweepstakes; or (C) invest for financial profit. The enhancement would apply, for example, if the defendant conducted or participated in a telemarketing campaign that solicited a

large number of individuals to purchase fraudulent
life insurance policies.

*Id.* cmt. n.3. "We are bound by the interpretative commentary
of the Sentencing Guidelines unless it violates the Constitu-
tion, a federal statute, or is inconsistent with the guideline
itself." *United States v. Pirello*, 255 F.3d 728, 731 (9th Cir.
2001).

At trial, ample evidence demonstrated that Hampton Porter
solicited clients in part through cold-calling large numbers of
potential clients. Hampton Porter secured many clients,
including several of the testifying victim-witnesses, through
its cold-calling practice. Defendants do not dispute that
Hampton Porter solicited clients in this manner. Defendants
argue, instead, that any cold-calling was incidental to the
fraudulent scheme, or that it was done primarily for legitimate
purposes (i.e., to solicit clients for legitimate stock purchases).
But the "pump and dump" scheme could not function without
securing new and unsuspecting clients. Even if the telemar-
keting campaign was done, in part, for legitimate purposes, on
this record it is undeniable that the telemarketing also was
done, in part, for fraudulent purposes.

**[28]** The example given in the Guideline's application
note, quoted above, guides our analysis. If the example's
hypothetical insurance company solicited *some* clients
through non-telemarketing means and if the company sold
*some* legitimate policies, it seems clear that the enhancement
would apply nevertheless. The text of the enhancement does
not require that the *only* means of solicitation was through
mass-marketing but, rather, whether that means of solicitation
played some non-trivial role in the commission of the crimi-
nal offense. *Cf. United States v. Olshan*, 371 F.3d 1296, 1299
(11th Cir. 2004) (rejecting the defendant's argument that the
enhancement should not apply "where the targeted audience
is drawn from the defendant's existing client list, . . . instead
of from the public at large or some subgroup of it with whom

the defendant has had no prior dealings"). We hold that the district court did not err by applying this enhancement.

[29] Defendant Montesano also argues that it was impermissible to apply an enhancement for *both* mass-marketing *and* the number of victims. The text of the Guideline states the opposite, because it lists the enhancements in separate, independent subsections:

> (2) If the offense involved . . . (B) a scheme to defraud more than one victim, increase by 2 levels.

> (3) If the offense was committed through mass-marketing, increase by 2 levels.

U.S.S.G. § 2F1.1(b). The intent of the Sentencing Commission is clear: Enhancements under both subsection (2) and subsection (3) could apply. As the government explains, the conduct described in those subsections does not necessarily overlap: One can defraud only one victim through a mass-marketing scheme, and one can defraud more than one victim but not use mass-marketing. For those reasons, applying an enhancement for mass-marketing and for the number of victims does not constitute impermissible double-counting. In so holding, we join the Tenth and Eleventh Circuits. *Olshan*, 371 F.3d at 1301; *United States v. Fredette*, 315 F.3d 1235, 1244-45 & n.4 (10th Cir. 2003).

Defendant Montesano insists that the Sentencing Commission intended the enhancements to be in the alternative, and not cumulative, because of the 2001 amendments to this Guideline. The applicable Guideline currently states:

> (2) (Apply the greatest) If the offense—

> (A) (i) involved 10 or more victims; or (ii) was committed through mass-marketing, increase by 2 levels;

(B) involved 50 or more victims, increase by 4 levels; or

(C) involved 250 or more victims, increase by 6 levels.

U.S.S.G. § 2B1.1(b) (2009).

We agree that the 2001 amendment indeed changed the calculations so that, under the plain text of the Guideline, mass-marketing is an alternative enhancement for number of victims. But nothing in the amendment suggests that the change was retroactive. Moreover, the other 2001 changes to the Guideline, such as the loss-amount chart, greatly increased the enhancements. For instance, a $1 million loss under the old Guideline resulted in an 11-level increase, but the new Guideline mandates a 16-level increase for the same loss amount. The district court applied the 1998 Guidelines because—overall—they are more favorable to Defendants (and Defendants do not contest that choice). Defendant Montesano appears to be cherry-picking which amendments he would like and which amendments he would not like. That he cannot do.

### 5. *Abuse-of-Trust Enhancement*

"If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic." U.S.S.G. § 3B1.3. Defendants argue that the district court erred by imposing the two-level enhancement for abuse of trust. They contend that their conduct did not meet the first sentence of the enhancement because it was not an abuse of trust. Additionally, Defendant Montesano argues that the enhancement cannot be applied because any abuse of trust "is included in the base offense

level" and thus violates the second sentence of the enhancement.

### a.   *Was Defendants' Conduct an "Abuse of Trust"?*

The scope of the "abuse of trust" enhancement was the subject of a recent en banc decision. In *Contreras*, 593 F.3d at 1136, sitting en banc, we adopted all but two small sections of the three-judge panel opinion in the case, 581 F.3d 1163. Through incorporation of the three-judge panel opinion, we overruled longstanding precedent on what the government must show in order to establish that a person is in "a position of public or private trust." U.S.S.G. § 3B1.3. We held that, contrary to a long line of cases, a person must hold "a position of 'professional or managerial discretion.' " *Contreras*, 581 F.3d at 1167. The defendant must be "a 'professional' or 'manager' who, because of his or her special knowledge, expertise, or managerial authority, is trusted to exercise 'substantial discretionary judgment that is ordinarily given considerable deference.' " *Id.* at 1168 n.5 (some internal quotation marks omitted) (quoting U.S.S.G. § 3B1.3 cmt. n.1). We held that our earlier cases permitting a finding of a position of trust under a much lower standard were too broad, and impermissibly encompassed positions such as truck driver and bank teller. *Id.* at 1167.

We decided *Contreras* after the sentencing hearings in the present case, at which the district court applied the then-correct, but now overruled, legal standard. On remand, the district court must assess this enhancement anew, using the new, more stringent legal test.

### b.   *Is "Abuse of Trust" Encompassed by the Base Offense Level?*

[30] Defendant Montesano argues that the abuse-of-trust enhancement is impermissible because an abuse of trust is included in the base offense level. *See* U.S.S.G. § 3B1.3

("This adjustment may not be employed if an abuse of trust
or skill is included in the base offense level . . . ."). Because
this argument is independent of our new legal standard, we
address it now. The base offense level here encompasses a
wide variety of crimes: "Fraud and Deceit; Forgery; Offenses
Involving Altered or Counterfeit Instruments Other than
Counterfeit Bearer Obligations of the United States." *Id.*
§ 2F1.1. Not all of those crimes necessarily include an abuse
of trust; for example, one can commit forgery without an
abuse of trust. Accordingly, the second sentence of § 3B1.3
does not apply. *See United States v. Ajiboye*, 961 F.2d 892,
895 n.4 (9th Cir. 1992) (holding that the second sentence of
§ 3B1.3 does not apply to the base offense level for "Larceny,
Embezzlement, and Other Forms of Theft" because that "pro-
vision of the Guidelines does not include 'an abuse of trust or
skill' in it"). Joining the Fifth and Tenth Circuits, we hold that
the abuse-of-trust enhancement is not included in the base
offense level under Sentencing Guideline § 2F1.1. *See United
States v. Gallant*, 537 F.3d 1202, 1243 (10th Cir. 2008) ("[I]t
is well-established that an abuse of trust is not incorporated in
the base offense level for fraud under § 2F1.1."), *cert. denied*,
129 S. Ct. 2026 (2009); *United States v. Buck*, 324 F.3d 786,
792-93 (5th Cir. 2003) (holding that an abuse-of-trust
enhancement is permissible when the base offense level is
under § 2F1.1).

[31] Defendant Montesano's true argument is that he
"could not be saddled with the two-level, abuse-of-trust
enhancement because *his offenses of conviction* necessarily
included his position of trust." Appellant Montesano's Open-
ing Br. at 11 (emphasis added). But Defendant Montesano
misstates the legal test. The enhancement is inapplicable only
if the *base offense level* necessarily includes an abuse of trust,
regardless whether the defendant's *offenses of conviction*
include an abuse of trust. *See United States v. Levy*, 992 F.2d
1081, 1084 (10th Cir. 1993) (holding that Sentencing Guide-
line § 3B1.3 "directs that we look to the base offense level . . .
assigned by the guidelines to the crime of conviction. It does

not direct us to the elements of the offense itself." (citing *Aji-boye*, 961 F.2d at 895 n.4)). The apparent concern of the Sentencing Commission was that, if the Sentencing Commission had already incorporated an abuse-of-trust consideration into its base offense level calculation, it would constitute unfair "double counting" to apply this enhancement. Where the abuse-of-trust consideration is *not* included in the base offense level, no unfairness results.

### C.  *Loss Enhancement*

According to the government, there are approximately 100 victims of the conspiracy. But the government conducted an investigation into the activities of only 30 of those victims, many of whom were clients of Defendants'. The government then calculated the 30 investigated victims' losses with respect to the four house stocks. The government calculated their losses individually, by taking the full purchase price paid by a victim *minus* the residual value of the stock in April 2001 —the date when Hampton Porter closed its doors and clients were required to transfer their holdings to a different brokerage firm.[11] The government then attributed to each Defendant the losses specific only to that Defendant's clients. The government used the same loss amount as the recommended amount of restitution. The Presentence Reports adopted the government's calculations, and the district court adopted the findings in the Presentence Reports.

The loss amount corresponds to an enhancement under the chart at Sentencing Guideline § 2F1.1(b)(1). Depending on the loss amount specific to each Defendant, Defendants here received enhancements ranging from 8 levels to 13 levels.

Defendants challenge (1) the applicable legal standard, (2)

---

[11]The residual value calculation for one of the house stocks was as of February 2001 instead of April 2001. No party challenges that disparity.

the sufficiency of the evidence, (3) the failure to offset gains, and (4) the calculation method generally.

### 1. Applicable Legal Standard

Defendant Laurienti argues that the district court should have applied the "clear and convincing" standard, instead of the "preponderance of the evidence" standard, when making its factual findings related to loss. Because each Defendant was convicted of conspiracy, and because the losses were incurred because of that conspiracy, the "preponderance of the evidence" standard applies. *United States v. Harrison-Philpot*, 978 F.2d 1520, 1523-24 (9th Cir. 1992); *see also United States v. Riley*, 335 F.3d 919, 926 (9th Cir. 2003) (applying *Harrison-Philpot*).

### 2. Sufficiency of the Evidence

Defendants next argue that the government did not meet its burden of establishing that the clients who did not testify at trial were victims, because there was insufficient evidence to establish that those clients invested because of the criminal conspiracy. Defendants do not challenge that the non-testifying clients bought house stocks and suffered losses. Instead, Defendants argue that the district court could not have concluded, without more evidence, that those clients were victims of the conspiracy. We disagree. Defendants were convicted of criminal conspiracy to defraud clients specifically by recommending the house stocks; in the circumstances shown in this record, it is reasonable to infer that all clients of Defendants who purchased the house stocks were duped by the conspiracy. Except as described below, Defendants did not offer any evidence to rebut that inference.

[32] Defendant Laurienti presented evidence that two of his clients were not victimized. In its briefing on appeal, the government concedes that the loss calculation should not have included those two clients' losses. Appellee's Br. at 91 n.33.

We agree and hold that the district court erred by including those clients' losses in the loss calculation.

[33] Defendant Parker presented evidence that two of his clients suffered much smaller losses than the losses calculated by the government. In its briefing on appeal, the government admits that Defendant Parker's calculations are correct: Two of his clients suffered smaller losses. Appellee's Br. at 104-05. We agree and hold that the district court erred by overstating the losses to those clients.

### 3. *Failure to Offset Gains*

The government calculated the losses for a particular victim as follows. For each house stock that a victim bought, the government calculated the total *net* loss or gain *for that stock* by that victim. It then added up all of the net losses that the victim incurred, ignoring any house stocks in which the victim had accrued a gain. For instance, if a victim lost $200,000 on stock A but gained $50,000 on stock A in an earlier transaction, then the total loss would be $150,000. But if the victim lost $200,000 on stock A and gained $50,000 on stock B, then the total calculated loss would be $200,000: The $50,000 gain was not factored in, because the gain accrued on a different house stock.

[34] There is no logical reason to offset gains made on one house stock, but not to offset the gains made on a different house stock. The single scheme to defraud encompassed all four house stocks. For a given victim, it is the net loss or gain of all house stocks that truly accounts for the actual loss to the victim as a result of the scheme to defraud. *Cf. United States v. Orton*, 73 F.3d 331, 334 (11th Cir. 1996) (holding that, in calculating loss from a Ponzi scheme, the district court correctly calculated the net loss to the losing victims); *United States v. Mount*, 966 F.2d 262, 265 (7th Cir. 1992) (noting that "a fraud that consists in promising 20 ounces of gold but delivering only 10 produces as loss the value of 10 ounces of

gold, not 20"). The proper focus is on the amount of loss for
a particular victim. It is true that, for those clients who experi-
enced a gain as a result of the fraudulent scheme, the govern-
ment correctly determined that those gains should not be used
to offset the losses to *other victims*. *Orton*, 73 F.3d at 334.
But, for any given victim, it is the net loss that matters; there
is no basis for selectively offsetting gains for some house
stocks but not others. We hold that the district court's calcula-
tion method erred in this regard.

### 4.   *Calculation Method Generally*

Defendants argue that the district court's calculation
method is also contrary to our opinion in *United States v.
Zolp*, 479 F.3d 715 (9th Cir. 2007). In *Zolp*, the defendant had
conducted a "pump and dump" scheme similar to the one at
issue here. The stocks in that case came from legitimate com-
panies whose stock values were inflated through the fraudu-
lent scheme. *Id.* at 717. The district court calculated the actual
loss as the amount that the victims paid to buy the stock, with
no offset for the present-day value of the stock. *Id.* 717-18.
We held that that calculation method was erroneous. *Id.* at
718-19. If the underlying company was worthless or practi-
cally worthless, it is reasonable to use the total investment
cost as the actual loss. *Id.* at 719. But, if the underlying com-
pany has intrinsic value, then the use of the total investment
cost is erroneous. *Id.* We held that,

> because the stock continues to have residual value
> after the fraudulent scheme is revealed, the court
> may not assume that the loss inflicted equals the full
> pre-disclosure value of the stock; rather, the court
> must disentangle the underlying value of the stock,
> inflation of that value due to the fraud, and either
> inflation or deflation of that value due to unrelated
> causes.

*Id.*

[35] The government argues that the district court's calcu-
lation method here is consistent with *Zolp* because, unlike in
*Zolp* where the district court used no offset, the district court
here offset the victim's losses with the market value of the
stock as of April 2001. We are only partially persuaded. In
*Zolp*, we held that the district court "must disentangle the
underlying value of the stock, inflation of that value due to the
fraud, *and* either inflation or deflation of that value due to
unrelated causes." *Id.* (emphasis added). Although the district
court here accounted for "the underlying value of the stock,"
it did not account for the market forces that also contributed
to the decrease in stock value. It is undeniable that, in addition
to the fraud, the market's drop in 2000 had an effect on stock
values.

We are aware, and Defendants do not appear to dispute,
that some of the house stocks may have fallen into the cate-
gory of "practically worthless" stocks that we discussed in
*Zolp*. On remand, for each house stock, the district court must
either make a finding that the stock is "practically worthless,"
as discussed in *Zolp*, or it must estimate the "inflation or
deflation" of the value of the house stock due to market
forces, unrelated to the conspiracy.

### 5.  *Holistic Perspective*

The thrust of the government's arguments concerning the
loss calculation is that, even if there are some minor errors,
the Sentencing Guidelines require only a reasonable estimate,
not mathematical precision. There is force to the govern-
ment's argument. "The district court's determination of loss
is a finding of fact to which we must give 'appropriate defer-
ence,' *see* U.S.S.G. § 2B1.1, cmt. n.3(C), and which we
review for clear error." *Zolp*, 479 F.3d at 718. "The court
need not make its loss calculation with absolute precision;
rather, it need only make a reasonable estimate of the loss
based on the available information." *Id.* at 719. The govern-
ment argues that, even if the district court's calculations were

somewhat erroneous, the calculated losses are a reasonable estimate of the loss caused by each Defendant and that, therefore, the loss calculations should not be reversed.

In this regard, the government points out that its calculation method is grossly in Defendants' favor in at least three ways. First, the government attributed to each Defendant only those losses that had a *direct connection* to the Defendant. Because Defendants were convicted of conspiracy, the government likely could have attributed almost all losses from the conspiracy to all Defendants. *See* U.S.S.G. § 1B1.3(a)(1)(B) (permitting loss calculation to include "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity"). Second, the government's calculation contained losses only with respect to the 30 victim-clients that it investigated. The government asserts that approximately 70 other victim-clients could be investigated. Third, the government could have chosen to calculate intended loss instead of actual loss. The government asserts that the intended loss of the conspiracy was much greater than the actual loss suffered by the victims. In sum, had the government so chosen, it could have introduced evidence of *much greater* losses for all Defendants. That being so, the government argues, its chosen calculation method is a reasonable estimate, even though it does contain some mathematical errors.

We acknowledge that the loss calculation need be only a reasonable estimate. In the context of this case, though, we are unpersuaded that the "reasonable estimate" requirement allows us to overlook the district court's many errors, particularly because many of the errors suffer from logical defects. All methodologies for estimation have inherent imperfections; otherwise they would be precise calculations, not estimates. So long as those imperfections are logical and are not prone to overwhelming the final result, they are permissible. But where, as here, the imperfections are illogical, such as the failure to offset gains in certain house stocks, it is impossible

to tell whether the ultimate estimate is reasonable or not. Having chosen to calculate actual loss for a subset of victims tied to each Defendant, the government cannot now argue that its flaws in calculation are irrelevant simply because it could have calculated loss differently.

On the other hand, the government has always made clear, to the court and to Defendants, that its loss calculations could greatly exceed the loss calculations that it actually submitted to the district court. Defendants nevertheless chose to appeal the government's calculation method. Because we remand for resentencing on an open record, the government is free to present evidence concerning any calculation methods that are consistent with the Sentencing Guidelines, our discussion above, and its ethical obligations. *See Nulph v. Cook*, 333 F.3d 1052, 1057 (9th Cir. 2003) ("A defendant has a due process right under the Fourteenth Amendment not to be subjected to vindictive sentencing after successfully attacking a conviction or sentence.").

## D.   *Restitution Orders*

[36] Finally, Defendants challenge the calculation of loss for purposes of restitution. Although a reasonable estimate suffices for the loss calculation, "[t]he amount of restitution must be definite and limited by the amount actually lost by the victims." *United States v. Barany*, 884 F.2d 1255, 1260 (9th Cir. 1989) (internal quotation marks omitted). As discussed above, the district court erred in certain respects in its calculation of loss. Accordingly, we vacate all four restitution orders and remand for recalculation of actual loss.

Convictions AFFIRMED; sentences and restitution orders VACATED and cases REMANDED for resentencing and recalculation of restitution.